## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## WESTERN DIVISION

NICOLE A. CLAY,

        Plaintiff,

vs.

WOODBURY COUNTY, IOWA;
GLENN J. PARRETT, individually and as
Sheriff of Woodbury County, Iowa; and
AMY STRIM, BRIGID DELANEY,
JORMA SCWEDLER, and DUSTIN
DeGROOT, individually and as Deputy
Sheriffs/Jailers of Woodbury County,
Iowa; and the CITY OF SIOUX CITY,
IOWA, and BRAD ECHTER, individually
and as a Police Officer for the City of
Sioux City,

        Defendants.

No. C 12-4042-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING PLAINTIFF'S
MOTION TO EXCLUDE EXPERT
TESTIMONY AND REPORT OF
DONALD LEACH, II, AND
DEFENDANTS' MOTIONS FOR
SUMMARY JUDGMENT**

————————————————

## TABLE OF CONTENTS

I.     **INTRODUCTION**..............................................................**4**
    A.    *Factual Background For Summary Judgment* ...............**4**
        1.    *Clay's arrest* .................................................**5**
        2.    *Clay's booking* ...........................................**5**
        3.    *Escalation of the incident in the holding cell* ........**7**
    B.    *Factual Background For The Motion To Exclude Expert*
        *Evidence* ...............................................................**8**
    C.    *Procedural Background* ......................................**12**
        1.    *Clay's claims* ...........................................**12**
        2.    *The pending motions* ................................**15**

II.    **CLAY'S MOTION TO EXCLUDE EXPERT EVIDENCE** .......................**16**

III.   **THE SUMMARY JUDGMENT MOTIONS** ..........................................**20**

A.      *Standards For Summary Judgment* ............................................. 20
B.      *The City Defendants' Motion For Summary Judgment* ................... 21
      1.    *"Qualified immunity"* ....................................................... 22
            *a.    Arguments of the parties* ...................................... 22
            *b.    "Qualified immunity" standards* ............................ 23
            *c.    Application of the standards* .................................. 24
      2.    *"Monell liability"* .............................................................. 25
      3.    *Immunity pursuant to* IOWA CODE *§ 670.4(3)* ...................... 25
      4.    *Claim based on the Iowa Constitution* ............................. 26
      5.    *Summary* .......................................................................... 26
C.      *The County Defendants' Motion For Summary Judgment* .............. 27
      1.    *The nature and scope of Clay's claims in Count IV* .............. 27
      2.    *"Qualified immunity"* ...................................................... 33
            *a.    Clay's "violation of privacy rights" claim* .................. 33
                *i.    Arguments of the parties* .............................. 33
                *ii.    Analysis* ..................................................... 34
            *b.    Clay's "excessive force" claim* ............................... 38
                *i.    Arguments of the parties* .............................. 38
                *ii.    Analysis* ..................................................... 39
            *c.    Clay's "free speech retaliation" claim* ...................... 42
                *i.    Arguments of the parties* .............................. 42
                *ii.    Analysis* ..................................................... 43
      3.    *Other grounds for summary judgment* ............................. 46
      4.    *Summary* .......................................................................... 47

IV.    *CONCLUSION* ......................................................................... 48

In this action pursuant to 42 U.S.C. § 1983, a female arrestee asserts that defendant jail officers "strip searched" her without reasonable suspicion and in an unconstitutional manner in front of male and female officers, and did so in retaliation for her vociferous complaints about her detention and a search of her purse

and cell phone, all in violation of the United States and Iowa Constitutions. Thus, this case is similar in several respects to *Peters v. Woodbury County, Iowa*, No. C 12-4070-MWB (N.D. Iowa), another case that recently came before me on motions for summary judgment, in which the plaintiff and the defendants were represented by the same counsel who represent the plaintiff and some of the defendants here. The plaintiff here does not expressly assert a claim denominated as "excessive force" arising from the alleged "strip search," as did the plaintiff in *Peters*, but she does assert a claim that a defendant city police officer searched her cell phone and purse in violation of her rights under the United States and Iowa Constitutions, which is different from any claim raised in *Peters*.

The "County Defendants" (jail officers, the former county sheriff, and the county) have moved for summary judgment on the plaintiff's "strip search" and "retaliation" claims on essentially the same grounds that the defendants raised in *Peters*, including "qualified immunity," lack of a cause of action under the Iowa Constitution, and lack of any basis for "*Monell* liability" of the former sheriff and the county. *See Peters v. Woodbury County, Iowa*, ___ F. Supp. 2d ___, 2013 WL 5775027 (N.D. Iowa Oct. 25, 2013). The "City Defendants" (the city police officer who arrested the plaintiff and the city) have moved for summary judgment on the "unconstitutional property search" claim against them, also on the basis of qualified immunity, invalidity of such a claim based on violation of the Iowa Constitution, and lack of any basis for "*Monell* liability." Also, as a preliminary matter, the plaintiff here seeks to exclude the testimony and report of the same defendants' expert on essentially the same grounds raised by the plaintiff in *Peters*, that is, that the expert has applied the wrong legal standard to her claims and has opined on legal conclusions that are within the province of the court.

# I. INTRODUCTION

## A. Factual Background For Summary Judgment

As in *Peters*, my determination of what facts are actually disputed in this case—and then whether those disputes are genuine and material—has been complicated by the parties' submissions and, sometimes, by the lack thereof. In the first instance, the factual background stated here is drawn primarily from the County Defendants' and the City Defendants' separate Statements Of Undisputed Material Facts In Support Of [Their] Motion[s] For Summary Judgment (docket nos. 54-1 and 57-1) and the plaintiff's Response[s] to those Statements Of Undisputed Material Facts (docket nos. 61-2 and 64-1). The plaintiff did not submit a statement of additional material facts that she contends preclude summary judgment in response to either Motion For Summary Judgment, however, as required by N.D. IA. L.R. 56(b)(3). Even so, the parties apparently agree that the defendants' Statements Of Undisputed Material Facts and the plaintiff's Responses are not exhaustive of factual issues material to the defendants' Motions For Summary Judgment, because both the defendants and the plaintiff repeatedly recite and rely on additional facts in their briefs, both with and without adequate citations to the parties' appendices or other portions of the record. A further problem here is that the plaintiff has failed to cite any parts of the record to support what appear to be her partial admissions or qualifications of certain factual statements, contrary to the requirements of N.D. IA. L.R. 56(b). Thus, some of the facts are deemed undisputed because of the plaintiff's failure to respond appropriately to the defendants' pertinent statements of undisputed facts. *See* N.D. IA. L.R. 56(b).[1]

---

[1] Pursuant to N.D. IA. L.R. 56(b), a resistance to a motion for summary judgment requires, *inter alia*, "[a] response to the statement of material facts in which the resisting party expressly admits, denies, or qualifies each of the moving party's

(Footnote continued . . .

Thus, unless otherwise indicated, the facts stated below are from the defendants' Statement[s] Of Undisputed Material Facts, and the plaintiff has expressly admitted them.

## 1. Clay's arrest

On August 13, 2011, defendant Sioux City Police Officer Brad Echter responded to a disturbance call at the Firehouse Bar in Sioux City at 12:36 a.m. After arrival at the Firehouse Bar, Officer Echter arrested plaintiff Nicole A. Clay for public intoxication. The City Defendants allege that Clay was "highly intoxicated" at the time, but Clay admits only that she was "intoxicated," albeit with no citation to any part of the record to support her partial admission or qualification of the City Defendants' allegation. I do not find that the degree of Clay's intoxication is material to the disposition of any portion of the pending motions. After arresting Clay, Officer Echter transported her to the Woodbury County Jail.

## 2. Clay's booking

Officer Echter arrived at the jail with Clay at 12:43 a.m. and escorted Clay to the booking counter where Defendant County Officers Jeremy Stroman (since dismissed), Amy Strim, and Brigid Delaney were present. The City Defendants allege

---

numbered statements of fact" and further specifies that "[a] response to an individual statement of material fact that is not expressly admitted must be supported by references to those specific pages, paragraphs, or parts of the pleadings, depositions, answers to interrogatories, admissions, exhibits, and affidavits that support the resisting party's refusal to admit the statement, with citations to the appendix containing that part of the record." As noted in the body of this ruling, the plaintiff has not complied with these requirements. The instances in which this has occurred will be identified in the body of this ruling. Pursuant to N.D. IA. L.R. 56(b), "[t]he failure to respond, with appropriate citations to the appendix, to an individual statement of material fact constitutes an admission of that fact." I will indicate where I have deemed specific factual statements admitted by the plaintiff's failure to respond to them appropriately.

that, while at the booking counter, Officer Echter performed a brief search of Clay's purse lasting less than 90 seconds. Clay "admits" the rather different fact that Officer Echter took almost everything out of her purse, then put everything back, in a short period of time. Clay cites in support of this partial admission or qualification the County Defendants' Summary Judgment Appendix at 72, a page that does not, in fact, exist in either the County Defendants' Summary Judgment Appendix (which ends at page 71)[2] or the City Defendants' Summary Judgment Appendix (which has no page numbers, but ends at docket page 7). Thus, Clay's partial admission or qualification must be disregarded, unless it is elsewhere supported by adequate citations to the record, and the City Defendants' allegation that Officer Echter performed a brief search of Clay's purse lasting less than 90 seconds must be deemed admitted. If necessary, I will consider in my legal analysis whether the scope or duration of Officer Echter's search of Clay's purse is material to my disposition of any part of any pending motion.

The County Defendants and Clay agree that Clay was visibly upset at the booking counter. Clay explains, without citation to any supporting parts of the record, that she was upset when Officer Echter started going through her purse and even more upset when he started going through her cell phone. The County Defendants and Clay agree that Clay voiced objections to her arrest and detention, the search of her purse, and the alleged search of her cell phone by Officer Echter. They also agree that Clay

---

[2] The last page of the County Defendants' Summary Judgment Appendix plainly is not the one that Clay intended to cite, because it is a page from the Woodbury County Sheriff's Office–Jail Division Procedures And Guidelines. *See* docket no. 54-2 at 71. Docket page 72 of the County Defendants' Summary Judgment Appendix (docket no. 54-2), that is, page 72 of 81, is also plainly inapposite, because it is the first page of the same Woodbury County Sheriff's Office–Jail Division Procedures And Guidelines.

refused to answer standard booking questions posed to her by Officer Stroman, so the booking process was terminated. Female Officers Strim and Delaney then escorted Clay to a temporary holding cell.

### 3. *Escalation of the incident in the holding cell*

The County Defendants assert, and Clay admits, that Woodbury County Jail Standing Operating Guideline (Jail SOG) § 4.10.1(6)(a) requires an inmate to remove an under-wire (wire or plastic) bra, which is then inventoried with the inmate's personal property, so that inmate cannot use the under-wire to create a weapon or tool to escape. *See* County Defendants' Summary Judgment Appendix at 37 (Jail SOG § 4.10.1, requiring removal of under-wire bras); *id.* at 28 (Deposition of Officer Delaney at 93-94, explaining the reasons for removal of under-wire bras). After Clay entered the temporary holding cell, Officer Strim told Clay that she would have to remove her under-wire bra and change into a jail jumpsuit, which Strim had brought to the cell. Officer Strim then expressly directed Clay to remove her under-wire bra and to change into a jail jumpsuit, pursuant to jail policy, but Clay refused to do so. The County Defendants allege that Officer Delaney then stated, "We can do this the easy way or the hard way," and that Clay responded, "Do it the hard way." Although Clay admits the factual allegation in the preceding sentence, she adds, without citation to any portion of the record, that she refused to take off her top and bra with officers in the room.

The County Defendants state that, *according to Clay's testimony*, the female officers present then paused, and Officer Delaney said, "Are you ready, one, two, three," and Officers Strim and Delaney grabbed Clay and threw her onto the bunk, in the course of which they hit Clay's head against the wall, and Clay ended up on the bunk face down. Clay admits this statement of fact. The County Defendants then state that, *also according to Clay's testimony*, the female officers forcefully removed Clay's

7

shirt and bra, and male officers, defendant Officers Schwedler and DeGroot, entered the cell to assist the female officers. Clay also admits this statement of fact. A party's allegation about what another party *alleges* in his or her deposition testimony does not actually allege any *facts regarding the incident*, but is apparently an invitation for me to take the facts alleged in the other party's testimony as true for purposes of summary judgment. The nature of the male officers' "assistance" is not stated in either of the defendants' Statements of Facts or Clay's Responses.

Video cameras in the jail record what occurred at the booking counter and show the hallway outside the temporary holding cell, but do not show what transpired in the temporary holding cell.[3]

## B.    *Factual Background For The Motion To Exclude Expert Evidence*

As explained, below, Clay seeks to exclude expert testimony and to strike the expert report of the County Defendants' expert, Donald Leach II. As in *Peters*, Clay has failed to submit with her motion challenging the expert's evidence a copy of the challenged expert's report, even though she refers to it as her "Exhibit 1." Clay also cites to portions of the depositions of various parties and witnesses, but, like the plaintiff in *Peters*, she failed to attach any of those deposition excerpts to her motion, and I ordinarily would not have access to them. In response to Clay's motion challenging their expert, however, the County Defendants provided an appendix including the challenged expert's report, the plaintiff's expert's report, various

---

[3] The County Defendants state additional procedural matters in their Statement of Undisputed Material Facts, ¶ 10, and the City Defendants state additional procedural matters in their Statement of Undisputed Material Facts, ¶¶ 1-5, but I will address procedural matters below.

deposition excerpts, and some other documents. For purposes of providing the factual background to Clay's challenge to the County Defendants' expert, it is sufficient to quote certain portions of Mr. Leach's expert report.

Although Clay does not expressly assert a separate "excessive force" claim, Mr. Leach nevertheless states the following concerning "use of force issues," in Section X of his report, entitled "Comments And Basis For Opinion":

> I relied on my training and knowledge as a correctional administrator regarding the use of force as presented by the U.S. Supreme Court in *Hudson v. McMillian* (1992) and further recently reinforced in *Wilkins v. Gaddy* (2010) in evaluating circumstances involving the use of force. The attempt is to determine whether the use of force was "wanton and unnecessary" or "applied in good faith effort" to enforce facility rules and regulations. The five elements I use to make this determination, and as described by Mr. Collins in his Guide [are]:
>
> 1. What was the need for the use of force?
>
> 2. What was the threat reasonably perceived by the officers?
>
> 3. How much force was used in relation to the need?
>
> 4. What efforts were made to temper the use of force?
>
> 5. What injuries did the inmate sustain?
>
> This "need" includes a legitimate governmental interest in compelling the inmate to follow rules, regulations and reasonable officer directives. The failure to comply with an officer['s] directives can reasonably form the basis for the escalation in the use of force from officer directives to some form of physical control.

County Defendants' Appendix In Support Of Their Resistance To Plaintiff's Motion To Exclude Expert Testimony And Strike Expert Report Of Donald Leach II (Defendants' Appendix Regarding Expert) (docket no. 56-2), 73 (Leach Expert Report, unnumbered page 14) (footnotes omitted).

Although Mr. Leach referred to a "wanton and unnecessary" standard as the basis for his opinion on "use of force" issues, he summarized his opinion on the "use of force" issue in the following terms:

> 2.     The force used in conducting the search of Ms. Clay was reasonable and necessary given Ms. Clay's refusal to comply with the Deputies' directives, and the legitimate governmental interest in removing her clothing for her protection from potential self harming behaviors.    Such force is a routine and acceptable correctional practice in jails.

County Defendants' Appendix Regarding Expert at 70 (Leach Expert Report at unnumbered page 11).

In Section XI ("Analysis"), subsection B ("Use of Force on Ms. Clay") of his report, Mr. Leach offered various more specific opinions, none of which refer to a "wanton and unnecessary" standard.  First, he opined that "Ms. Clay's refusal to comply with officer directives coupled with her defiant and challenging behaviors resulted in the officers needing to use of [sic] force to effect compliance with following their directive." *Id.* at 80 (Leach Expert Report at unnumbered page 21).  Next, he opined that "[i]t was reasonable given Ms. Clay's prior behaviors for Officer Strim and Officer Delaney to perceive Ms. Clay as refusing to follow their directives." *Id.* at 81 (Leach Expert Report at unnumbered page 22).  He also opined,

> The female officers (Strim and Delaney) used a reasonable amount of force in placing Ms. Clay on the bunk.  The male officers (DeGroot and Schwedler) initially responded but other than removing her handcuffs did not use force on

> Ms. Clay. Upon Ms. Clay apparently realizing that the staff
> was going to use the force necessary to effect her
> compliance with their directives, she voiced a willingness to
> comply. The staff, both male and female officers[,]
> discontinued their use of force and Ms. Clay was permitted
> the opportunity to comply. The male officers left the cell
> but remained in the area should their assistance be needed
> again. Ms. Clay complied with the directive to exchange
> clothing without further use of force.

County Defendants' Appendix Regarding Expert at 81 (Leach Expert Report at
unnumbered page 22). Mr. Leach also opined, "The officers had a legitimate
government[al] interest in enforcing their directives when threatened by Ms. Clay's
continued noncompliance and challenging behaviors." County Defendants' Appendix
Regarding Expert at 82 (Leach Expert Report at unnumbered page 23). After
concluding that there was no indication that Clay sustained injuries requiring medical
care, *id*. at 82-83 (Leach Expert Report at unnumbered pages 23-24), Mr. Leach
offered the following conclusion:

> The use of force was reasonable and acceptable in light of
> Ms. Clay's refusal to follow the officers' directives, which
> were delivered several times. Once Ms. Clay voiced her
> willingness to comply with the directives, the officers' use
> of force ceased and she was given the opportunity to
> comply.

County Defendants' Appendix Regarding Expert at 83 (Leach Expert Report at
unnumbered page 24).

Finally, in Section XII ("Report Conclusion"), Mr. Leach opined, in pertinent
part, as follows:

> The Woodbury County Sheriff's Office has a
> legitimate governmental interest in the prevention of the
> introduction or possession of contraband. The definition of
> what constitutes contraband is within the discretion of the
> Woodbury County Jail administrators. Thereby, the

designation of specific articles of clothing as contraband, and prohibited, is within the purview of the jail administration along with the enforcement of that prohibition. Ms. Clay's refusal to follow the directives of the staff in removing her clothing and donning jail attire, coupled with her belligerent, oppositional and defiant behavior, developed the exigent circumstances that resulted in the reasonable and acceptable use of force in enforcing facility rules, regulations and officer directives. The search of Ms. Clay's personal property upon booking intake is a routine and acceptable correctional practice.

The actions of the Woodbury County Jail staff in the management of Ms. Nicole A. Clay during her incarceration on August 31, 2011 were reasonable and acceptable correctional practices.

County Defendants' Appendix Regarding Expert at 86 (Leach Expert Report at unnumbered page 27).


### C.    Procedural Background

#### 1.    Clay's claims

Clay initiated this lawsuit by filing her Class Action Complaint (docket no. 2) on April 27, 2012. The current version of her claims, however, is in her Third Amended And Substituted Class Action Complaint (Third Amended Complaint) (docket no. 37), filed January 2, 2013. In her Third Amended Complaint, Clay names as defendants Woodbury County, Iowa; Glenn J. Parrett, individually and as Sheriff of Woodbury County, Iowa; Amy Strim, Brigid Delaney, Jorma Schwedler, Dustin DeGroot, and Jeremy Stroman, individually and as Deputy Sheriffs/Jailers of Woodbury County, Iowa; the City of Sioux City, Iowa; and Brad Echter, individually and as a Police Officer for the City of Sioux City.

In Count I of her Third Amended Complaint, Clay asserts a claim of "unreasonable search and seizure in violation of the Fourth Amendment to the United States Constitution and Article I, § 8 of the Iowa Constitution as to plaintiff Clay against all defendants." This "unconstitutional property search" claim is premised on the search of her purse and cell phone. *See* Third Amended Complaint, Count I, ¶¶ 48, 54-55.

In Count II, Clay asserts a claim of "unreasonable search and seizure of person [sic] in violation of the Fourth Amendment to the United States Constitution and Article I, § 8 of the Iowa Constitution as to the class against defendants Woodbury County, Parrett and Sioux City," but this count actually alleges an "unconstitutional *property* search" claim on behalf of a class. This claim is premised on the search of "purses, satchels, cases and other closed containers, and/or cell phones, or other electronic devices, of all pre-arraignment detainees without a warrant or other legitimate basis for doing so." *See id.* at Count II, ¶¶ 61, 68-69.

In Count III, Clay asserts a claim "for declaratory and injunctive relief against defendants Woodbury County, Sioux City and Parrett." This "declaratory and injunctive relief" claim is also directed at the allegedly unconstitutional searches of "purses, satchels, cases and other closed containers, and/or cell phones, or other electronic devices, brought into the Woodbury County jail by pre-arraignment detainees without a warrant or other legitimate reason for such searches." *See id.* at Count III, ¶ 75.

In Count IV, Clay asserts a claim of "unreasonable strip search in violation of the Fourth Amendment to the United States Constitution and Article I, § 8 of the Iowa Constitution as to plaintiff Clay against defendants Woodbury County, Parrett, Strim, Delaney, Schwedler, DeGroot and Stroman," whom Clay identifies as the "County Defendants." This "strip search" claim is premised on the "strip search of Clay,

without regard to the scope of the particular intrusion and the manner in which the strip search was conducted." *See id.* at Count IV, ¶ 83. More specifically, Clay alleges that "[n]one of the County Defendants needed to be present in the holding cell while Clay changed into the prison issue jumpsuit and observing her while she t[oo]k her clothes off constitute[d] a strip search." *See id.* In this claim, Clay also alleges that "she was unreasonably and violently strip searched while being touched in otherwise clothed areas and having her unclothed breasts exposed to two female, and three male, Deputy Jailers." *Id.* at ¶ 87.

Finally, in Count V, Clay asserts a claim of "violation of freedom of speech guaranteed by the First Amendment to the United States Constitution and Article I, § 7 of the Iowa Constitution as to plaintiff Clay against [the County Defendants]." In this "free speech retaliation" claim, Clay alleges that "[t]he County Defendants strip searched Clay in violation of both the Constitutions of the United States and the State of Iowa, as set out in Count IV above, and in violation of Iowa law, I.C.A. 804.30, in retaliation for her loudly and vociferously protesting both her detention and the unlawful and unconstitutional search of her purse and cell phone." *Id.* at Count V, ¶ 94; *see also id.* at ¶ 98.

The County Defendants filed an Answer and Affirmative Defenses (docket no. 38) to Clay's Third Amended Complaint on January 4, 2013. Among other affirmative defenses, the County Defendants assert "qualified immunity," Answer, Affirmative Defenses, ¶¶ 4-5; lack of a basis for "*Monell* liability" of the County and Sheriff Parrett, *id.* at ¶ 9; and failure to state a claim for violation of the Iowa Constitution upon which relief can be granted, *id.* at ¶ 11. The City Defendants filed an Answer (docket no. 40) to Clay's Third Amended Complaint on May 28, 2013. The City Defendants also assert various affirmative defenses, including "absolute" or "qualified" immunity and lack of a basis for "*Monell* liability" of the City. On May 28, 2013, the

parties filed a Stipulation For Partial Dismissal Of [County] Defendant Jeremy Stroman And Count II (Class Action) (docket no. 39). On July 9, 2013, the parties filed a Stipulation For Partial Dismissal – Dismissing Count III Against All Defendants And Dismissing Count I Against [The County Defendants] (docket no. 52). In this second Stipulation, the parties clarified that the part of Count I relating to the wrongful search of Clay's cell phone was also dismissed as to the City Defendants, but that the part of Count I relating to the wrongful search of Clay's purse was *not* dismissed against the City Defendants. Thus, after these stipulations, Clay only asserted an "unconstitutional property search" claim against the City Defendants relating to the search of her purse (remaining portion of Count I); a "strip search" claim against the County Defendants (Count IV); and a "free speech retaliation" claim against the County Defendants (Count V).

### 2. *The pending motions*

On July 1, 2013, Clay filed her Motion To Exclude Expert Testimony And Strike Expert Report Of Donald Leach, II (Motion To Exclude Expert Evidence) (docket no. 50), which is the first of three now before me. The County Defendants filed a Resistance (docket no. 56) to Clay's Motion To Exclude Expert Evidence on July 12, 2013.

The other two motions now before me are motions for summary judgment. Specifically, on July 10, 2013, the County Defendants filed their Motion For Summary Judgment (docket no. 54), seeking summary judgment in the County Defendants' favor on the remaining claims against them in Counts IV and V. The City Defendants followed suit, by filing a Motion For Summary Judgment (docket no. 57) on July 15, 2013, seeking summary judgment on the remaining portion of the claim against them in Count I. Clay filed a Resistance (docket no. 54) to the County Defendants' Motion For Summary Judgment on September 5, 2013, and the County Defendants filed a Reply

(docket no. 67), in further support of their Motion For Summary Judgment, on September 16, 2013. Clay filed a Resistance (docket no. 61) to the City Defendants' Motion For Summary Judgment on September 5, 2013, but the City Defendants filed no reply.

The defendants requested oral arguments on their Motions For Summary Judgment, but Clay did not request oral arguments on her Motion To Exclude Expert Evidence. I have found the parties' written submissions on all three motions sufficient to address the issues raised. Moreover, my crowded schedule has not permitted the timely scheduling of oral arguments. Therefore, I have resolved the pending motions on the parties' written submissions.

## II.    CLAY'S MOTION TO EXCLUDE EXPERT EVIDENCE

In her Motion To Exclude Expert Evidence, Clay asserts, *inter alia*, that she has stated several claims, "including a claim for use of excessive force against her during her booking process and initial detention at the Woodbury County jail," and that Mr. Leach's opinions pertinent to such a claim "fail to meet the minimum admissibility requirements of Federal Rule of Evidence 702 because they rely on the incorrect legal standard, and further constitute inadmissible legal conclusions." Motion To Exclude Expert Evidence at ¶¶ 1-2.[4] I will take up this motion first, because it pertains to the proper record in the case, even though a ruling on any part of the defendants' Motions

---

[4] As is apparent from the summary of claims in Clay's Third Amended Complaint, above, however, Clay has not expressly asserted any "excessive force" claim, although she does complain about the use of force against her in her "strip search" and "free speech retaliation" claims in Counts IV and V, respectively.

For Summary Judgment ultimately may not turn on the admissibility of the challenged expert's opinions.

I need not set forth in detail either the parties' arguments concerning this motion or my analysis of the issues presented, because both the arguments and analysis of them here are essentially identical to the arguments and analysis in *Peters*. *Peters*, ___ F. Supp. 2d at ___, 2013 WL 5775027 at \*7-\*16. Here, it suffices to say that the decision to exclude or allow expert testimony is reviewed for abuse of discretion. *See United States v. Schwarck*, 719 F.3d 921, 923-24 (8th Cir. 2013). The admissibility of expert testimony depends upon both its "reliability" and its "relevancy." *See Schmidt v. City of Bella Villa*, 557 F.3d 564, 570 (8th Cir. 2009).

Here, Clay first challenges the "reliability" of Mr. Leach's expert evidence, where she contends that it is legally unsupportable, because Mr. Leach purportedly stated the wrong standard for "excessive force" claims in a case involving an arrestee or a pretrial detainee. For the reasons set out in *Peters*, ___ F. Supp. 2d at ___, 2013 WL 5775027 at \*10-\*11, Mr. Leach's reference to an Eighth Amendment "wanton and unnecessary" standard is wrong, but excluding Mr. Leach's opinions in their entirety and striking his expert report are extreme responses to an incidental misstatement of the applicable legal standard—particularly where it is for the *court* to determine and instruct the jury on the applicable legal standard. As noted above, where Mr. Leach actually states an opinion about the use of force in this case, he applies a "reasonableness" standard like the Fourth Amendment standard that is applicable under controlling law. I will not exclude either Mr. Leach's testimony or his report, in its entirety, on this ground.

As to Clay's "relevancy" challenge, for the reasons set out in detail in *Peters*, ___ F. Supp. 2d at ___, 2013 WL 5775027 at \*11-\*15, I conclude as follows. *Assuming that Mr. Leach is properly qualified and that proper disclosures of his*

*opinions have been made*, Mr. Leach would and would not be allowed to testify to the following matters in this case. First, Mr. Leach *would not be* allowed to opine on a factual matter on which the jurors are entirely capable of making a determination—such as what force was used by the officers, *see Lee v. Anderson*, 616 F.3d 803, 809 (8th Cir. 2010); *Westcott v. Crinklaw*, 68 F.3d 1073, 1076 (8th Cir. 1995), nor would he be allowed to base his opinion on what he believes the correct version of the facts to be. *Westcott*, 68 F.3d at 1076. On the other hand, if he is properly qualified, Mr. Leach *would be* allowed to explain the kind of force applied, such as the method used by Officers Delaney and Strim to "throw" Clay onto the bunk in the holding cell, and even whether or not using that particular method was appropriate in the circumstances presented, under recognized standards and practices for jail administration. *Cf. Southern Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc.*, 320 F.3d 838, 841 (8th Cir. 2003); *Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994). Also, Mr. Leach could permissibly testify as to what routine and acceptable correctional practices in jails are, based on his training and expertise as a correctional administrator and instructor. *Id.* I note that Mr. Leach's expert report does make permissible general references to certain statements of standards concerning "use of force" for the administration of jails or prisons. *See* County Defendants' Appendix Regarding Expert at 73 (Leach Expert Report at unnumbered page 14 & n.10). Mr. Leach *would be* allowed to respond to *abstract* or *hypothetical* questions by opining that the force described was or was not reasonable in the circumstances described in such a question, and *would even be* permitted to opine as to whether he *personally* believed that the force used against Clay was reasonable under the circumstances, but he *would not be* allowed to opine that the use of force satisfied the legal standard of "reasonableness." *United States v. Perkins*, 470 F.3d 150, 159-60 (4th Cir. 2006).

I note, however, that Mr. Leach's report makes no express reference to the purportedly generally applicable standards for jail administration in his analysis of the application of force to Clay, a topic on which the defendants contend that he will testify. Rather, he repeatedly states what may be prohibited *legal* opinions, rather than permissible *personal* opinions, that the Defendant Officers' application of force against Clay was "reasonable." To the extent that his references to "reasonableness" are opinions purportedly cast in terms of the applicable legal standard, they are inadmissible. Furthermore, he may not testify to any opinions about whether the legal standard was met, particularly where he frames that *legal* standard incorrectly as an Eighth Amendment "wanton and unnecessary" use of force standard. I also see little in Mr. Leach's report that could be considered an attempt to "ensure that the jury connected the dots from the objective facts to the conclusion that force was warranted." *Cavanaugh v. Woods Cross City*, 718 F.3d 1244, 1251 (10th Cir. 2013)I see nothing in the opinions of Mr. Leach, a purported "jail practices expert," suggesting "that under the circumstances faced by [the Defendant County Officers] a reasonable officer would have concluded that [Clay] was a threat and used similar force," stopping short of an opinion framed in terms of the ultimate legal question and the applicable legal standard. *Id.*

Consequently, I will not grant Clay's Motion To Exclude Expert Evidence to the extent of excluding Mr. Leach's testimony and report in their entirety. I will grant that Motion, however, to the extent that I will limit Mr. Leach's trial testimony in the ways described above.

### III.    THE SUMMARY JUDGMENT MOTIONS

Both the County Defendants and the City Defendants have filed Motions For Summary Judgment.  Before considering the issues raised in each of these motions, I will briefly summarize the standards applicable to motions for summary judgment.

### A.    Standards For Summary Judgment

Summary judgment is only appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c) (emphasis added); *see Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) ("Summary judgment is appropriate if viewing the record in the light most favorable to the nonmoving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law."); *see generally Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  Thus, "[t]he movant 'bears the initial responsibility of informing the district court of the basis for its motion,' and must identify 'those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (*en banc*) (quoting *Celotex*, 477 U.S. at 323).  In response, "[t]he nonmovant 'must do more than simply show that there is some metaphysical doubt as to the material facts,' and must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)).

When the parties have met their burden, the district judge's task is as follows:

> "On a motion for summary judgment, 'facts must be viewed
> in the light most favorable to the nonmoving party only if
> there is a genuine dispute as to those facts.'"    *Ricci v.*

> *DeStefano*, ---U.S. ----, 129 S. Ct. 2658, 2677, 174 L.
> Ed. 2d 490 (2009) quoting *Scott v. Harris*, 550 U.S. 372,
> 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007) (internal
> quotations omitted). "Credibility determinations, the weigh-
> ing of the evidence, and the drawing of legitimate inferences
> from the facts are jury functions, not those of a judge."
> *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133,
> 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000), quoting
> *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.
> Ct. 2505, 91 L. Ed. 2d 202 (1986). . . . . "'Where the
> record taken as a whole could not lead a rational trier of fact
> to find for the nonmoving party, there is no genuine issue
> for trial.'" *Ricci*, 129 S. Ct. at 2677, quoting *Matsushita*,
> 475 U.S. at 587, 106 S. Ct. 1348.

*Torgerson*, 643 F.3d at 1042-43. Summary judgment is particularly appropriate when only questions of law are involved, rather than factual issues that may or may not be subject to genuine dispute. *See, e.g., Cremona v. R.S. Bacon Veneer Co.*, 433 F.3d 617, 620 (8th Cir. 2006).

### B. The City Defendants' Motion For Summary Judgment

I will begin my analysis of the pending Motions For Summary Judgment with the City Defendants' Motion, because it addresses the claim that arose first, chronologically, in the factual circumstances, and because it addresses new territory, that is, an "unconstitutional property search" by the arresting officer a claim that is unlike any claim raised in *Peters*. As noted above, pursuant to the second Stipulation filed by the parties, this claim is now limited to the search of Clay's purse by City Police Officer Echter.

### 1. *"Qualified immunity"*

The City Defendants seek summary judgment on the remaining claim against them, first, on the basis of City Police Officer Echter's "qualified immunity." Clay denies that Officer Echter is entitled to "qualified immunity."

### a. *Arguments of the parties*

The City Defendants argue that a search incident to arrest may be made within a reasonable time after the arrestee arrives at the place of detention. Here, they argue, the search of Clay's purse occurred within less than 8 minutes of Officer Echter responding to the disturbance call at the bar. They rely on *Curd v. City Court of Judsonia, Ark.*, 141 F.3d 838 (8th Cir. 1998), in which the court held that a search of a purse 15 minutes after arrest was a valid search incident to arrest. The City Defendants also argue that Clay's purse was clearly large enough to hold contraband or weapons, as shown in the jail video. They also argue that property in a purse may be searched as part of a search of a person, because such property has been found to be more immediately associated with an arrestee than other personal property. The City Defendants also argue that there was no legal prohibition against Officer Echter performing an inventory of the purse to determine if any items contained in it should be entered into the Police Department Property System for safekeeping, rather than left at the jail.

In response, Clay argues that *Curd* is distinguishable, because the plaintiff in *Curd* asked to see her purse, and the officer searched the purse before placing it in her view. She argues that the Eighth Circuit Court of Appeals ruled that the search at issue in *Curd* was proper, because it was objectively reasonable to examine the purse for items that could be dangerous before placing the purse in the view or possession of a person charged with assault. Here, however, Clay argues that she did not have possession of her purse and did not ask to see it, and her charge of public intoxication

indicated no concern that she was violent or likely to assault anyone. She also contends that the Jail staff was poised to perform a property inventory search of her purse at the time that Officer Echter intervened to conduct his own search, and that there was no reason to suspect that the purse contained evidence related to her arrest for public intoxication. She argues that it was clearly established that a search without prior approval of a judge or magistrate is unconstitutional in the absence of certain exigencies that did not exist here.

### b. *"Qualified immunity" standards*

I set out in some detail in *Peters* the purpose of and standards for "qualified immunity." *See Peters*, ___ F. Supp. 2d at ___, 2013 WL 5775027 at *17-*20. Rather than repeat that statement of the applicable standards here, suffice it to say that "[e]valuating a claim of qualified immunity requires a 'two-step inquiry: (1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct.'" *Burton v. St. Louis Bd. of Police Cmm'rs*, ___ F.3d ___, ___, 2013 WL 5336524, *3 (8th Cir. Sept. 24, 2013) (quoting *Winslow v. Smith*, 696 F.3d 716, 730 (8th Cir. 2012), with internal quotation marks and citations omitted); *accord Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part by Pearson*, 555 U.S. at 236; *Johnson v. Carroll*, 658 F.3d 819, 825 (8th Cir. 2011); *Fields v. Abbott*, 652 F.3d 886, 890 (8th Cir. 20 11); *Krout v. Goemmer*, 583 F.3d 557, 564 (8th Cir. 2009). The official is entitled to qualified immunity unless the answer to both of these questions is "yes." *Burton*, ___ F.3d at ___, 2013 WL 5336524 at *3 (quoting *Winslow*, 696 F.3d at 730, with internal quotation marks and citations omitted); *Krout*, 583 F.3d at 564.

### c.    *Application of the standards*

Both the City Defendants and Clay rely on facts not addressed in the City Defendants' Statement Of Undisputed Material Facts or Clay's Response or elsewhere identified with citations to the record to support their arguments concerning the first "qualified immunity" inquiry, violation of a right.  Specifically, in their brief, the City Defendants rely on allegations that Officer Echter's search of Clay's purse was either "incident to arrest" or an "inventory search" without identifying any testimony or record evidence establishing or suggesting that either, rather than satisfying simple curiosity, was Officer Echter's purpose.  Similarly, in her brief, Clay relies on her allegations that she did not have possession or access to her purse at the Jail; that she had not requested to see her purse before Officer Echter searched it; that the purse was in the possession of Officer Echter or Jail staff at that time; that the purse was not going to be returned to her prior to her release; and that immediately after Officer Echter searched the purse, Jail staff conducted an inventory search to inventory the contents of the purse.  In her brief, Clay purports to cite a portion of the record, the County Defendants' Summary Judgment Appendix at 72, in support of her allegations, but as explained above, there is no such page in the County Defendants' Summary Judgment Appendix.

The district court is under no obligation "to plumb the record in order to find a genuine issue of material fact" or to "speculate on which portion of the record" might support a non-movant's claim.  *See Barge v. Anheuser-Busch, Inc.*, 87 F.3d 256, 260 (8th Cir. 1996) (internal quotation marks and citations omitted); *see also Torgerson*, 643 F.3d at 1042 (explaining the non-movant's burden in responding to summary judgment).  On the other hand, to obtain summary judgment, the movant must *first* "'inform[ ] the district court of the basis for its motion' and must identify 'those portions of [the record] . . . which it believes demonstrate the absence of a genuine

issue of material fact.'" *Torgerson*, 643 F.3d at 1042 (quoting *Celotex*, 477 U.S. at 323). Neither party has met its burden here, so summary judgment in favor of the City Defendants on Clay's "unconstitutional property search" claim in Count I on the basis of "qualified immunity" is inappropriate.

### 2. "Monell *liability*"

Next, the City Defendants contend that there is simply no evidence to support Clay's theory of "*Monell* liability"[5] against the City. In her Resistance, Clay expressly "concedes that the Court should grant summary judgment in favor of the City of Sioux City on her claims against it under *Monell*." Plaintiff's Resistance Brief (docket no. 8), 8. Therefore, the City is entitled to summary judgment on Clay's "unconstitutional property search" claim.

### 3. *Immunity pursuant to* IOWA CODE *§ 670.4(3)*

The City also asserts that it is immune from liability under IOWA CODE § 670.4(3) as a matter of law. Section 670.4 provides, in subsection (1), that a "municipality shall be immune from liability" in the absence of an express statute dealing with the claims at issue, and, in subsection (3), that "[t]his section does not expand any existing cause of action or create any new cause of action against a municipality." I need not reach the question of the effect of § 670.4(3) in this case, however, because Clay has conceded that there is no basis for "*Monell* liability" against

---

[5] *See Atkinson v. City of Mountain View, Mo.*, 709 F.3d 1201, 1214 (8th Cir. 2013) (explaining that, in *Monell v. Department of Social Servs. of New York*, 436 U.S. 658, 690–91 (1978), the Supreme Court held that "Section 1983 liability for a constitutional violation may attach to a municipality if the violation resulted from (1) an 'official municipal policy,' . . . (2) an unofficial 'custom,' . . . ; or (3) a deliberately indifferent failure to train or supervise").

the City, so that summary judgment is already appropriate on her claim against the City.

### 4. *Claim based on the Iowa Constitution*

Like the defendants in *Peters*, the City Defendants also assert that they are entitled to summary judgment on Clay's "unconstitutional property search" claim in Count I to the extent that the claim is based on the Iowa Constitution, because they argue that Iowa statutes do not recognize a civil claim for damages based on an alleged violation of the Iowa Constitution. Clay responds that this court has found that there is a common-law claim for violation of the Iowa Constitution. As I explained when addressing these arguments in *Peters*, Chief Judge Linda R. Reade has concluded that the Iowa Supreme Court would likely recognize such an action, as an analogue to an action against federal actors for violations of the United States Constitution in *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971). *McCabe v. Macaulay*, 551 F. Supp. 2d 771, 784-85 (N.D. Iowa 2007). I agree with Chief Judge Reade's analysis and conclude that the City Defendants are not entitled to summary judgment on the claim in Count I to the extent that it is based on a violation of the Iowa Constitution, because I conclude that such a claim is valid.

### 5. *Summary*

The City Defendants' Motion For Summary Judgment on Count I is granted in part and denied in part. Specifically, the motion is granted to the extent that Clay has conceded that the City cannot be liable on this claim pursuant to *Monell* and that conclusion renders moot the City Defendants' contention that the City is immune to the claim in Count I pursuant to IOWA CODE § 670.4(3). The motion is denied, however, as to defendant City Police Officer Echter, on Clay's claim in Count I that he unconstitutionally searched her purse, whether that claim is asserted pursuant to the

United States Constitution or the Iowa Constitution. On the present record, Officer Echter is not entitled to "qualified immunity" on that claim.

## C. The County Defendants' Motion For Summary Judgment

I turn, next, to the County Defendants' Motion For Summary Judgment on Clay's remaining claims of an unconstitutional "strip search" (Count IV) and "free speech retaliation" (Count V). Like the County Defendants in *Peters*, the County Defendants here seek summary judgment on these claims on the basis of "qualified immunity" of the Defendant County Officers, invalidity of claims for violation of the Iowa Constitution, and lack of a basis for "*Monell* liability" of the County and the Sheriff. Clay contends that her claims should survive summary judgment. Before considering the County Defendants' arguments, I must determine the nature and scope of Clay's claims and the constitutional bases for them, to address issues raised by the County Defendants.

### 1. The nature and scope of Clay's claims in Count IV

As I have noted more than once, above, Clay has not asserted any express "excessive force" claim. Nevertheless, in Count IV, Clay has asserted that her "strip search" in the Jail was unconstitutional in *manner*, not simply because it involved both male and female officers, but because "she was *unreasonably and violently strip searched* while being touched in otherwise clothed areas." Third Amended Complaint, at Count IV, ¶ 87 (emphasis added). Thus, while the *theory* of recovery is not expressly pleaded as "excessive force," the factual basis for an "excessive force" claim is plainly pleaded. Moreover, Clay asserted in her Motion To Exclude Expert Evidence that she has asserted "excessive force" claims. In their Motion For Summary Judgment, the County Defendants have assumed, at least for the sake of argument, that

Clay's "manner" claim in Count IV, which is based in part on the use of force to remove her clothing and injuries to her in the process, is an "excessive force" claim, and they have argued that they are entitled to "qualified immunity" on such a claim. *See* County Defendants' Summary Judgment Brief (docket no. 54-3) at 15-17.

Clay did not "take the bait," in response to the County Defendants' suggestion that she is asserting an "excessive force" claim, either by further amending her Complaint to assert a separate "excessive force" claim or by reformulating any part of her "strip search" claim based on the allegedly violent "manner" of the alleged "strip search" as an "excessive force" claim in her Resistance to the County Defendants' Motion For Summary Judgment. What she did do is assert the following in her Resistance:

> In addition to the involvement of the male officers, the evidence demonstrates that Clay was strip searched in a physically abusive way. When Clay refused to take off her top and bra with Strim and Delaney in the room and while Schwedler and DeGroot were in the hall where they could observe, Strim and Delaney picke[d] her up and threw her on the concrete bunk in the cell, and Strim forcefully removed Clay's top and bra. As a result of Defendants' actions, Clay incurred significant injuries, including: 1) a concussion; 2) neck pain; 3) a large bump on right back of the head; 4) pain and swelling in the right knee; 5) pain and swelling over the right temporal area; and 6) a dime sized abrasion on the mid back. Pl. App. 1-3.

Plaintiff's Resistance Brief (docket no. 64-4), 20. This argument plainly relies on the *amount of force used* and the *injury* purportedly inflicted as establishing a constitutional violation, independent of the presence of male or female officers.

Under these circumstances, I will construe Clay's "strip search" claim in Count IV as involving *two* claims: One part of that claim involves the question of the reasonableness of forcibly removing Clay's bra, in the presence of both male and

female officers, under the circumstances presented (the "privacy" claim); the other part involves the question of the reasonableness of the force used to remove Clay's bra (the "excessive force" claim). *Cf. Peters*, ___ F. Supp. 2d at ___, 2013 WL 5775027 at *23. Construing the first part of Clay's claim in Count IV in this way is consistent with her allegations in that count that "[n]one of the County Defendants needed to be present in the holding cell while Clay changed into the prison issue jumpsuit and [that] observing her while she t[oo]k her clothes off constitute[d] a strip search." *See* Third Amended Complaint, at Count IV, ¶ 83. These specific allegations focus on the *removal of Clay's bra, albeit forcibly, in the presence of officers (male or female)*, in response to a direction from the officers to remove her bra and her refusal to do so. Construing the second part of Clay's claim in Count IV as an "excessive force" claim is consistent with her allegations in that count that "she was *unreasonably and violently strip searched* while being touched in otherwise clothed areas." *See id.* at Count IV, ¶ 87 (emphasis added). These allegations focus on the *amount of force used in removing Clay's clothes*. Construing the parts of the claim in Count IV in this way is also consistent with the parties' understanding of the constitutional rights at issue, as explained above. Moreover, doing so serves the purposes of coherent analysis and coherent presentation of the claims to a jury, if Clay's claims proceed to trial, and is appropriate whether or not I agree with Clay's contention that she was "strip searched."

In point of fact, for many of the same reasons stated in *Peters*, ___ F. Supp. 2d at ___, 2013 WL 5775027 at *23-*30, I do not agree with that contention, but conclude, as a matter of law, that Clay was not "strip searched" and that no part of her claim in Count IV is subject to a constitutional standard that requires "reasonable

suspicion" for the "search" to be reasonable.[6] Somewhat more specifically, contrary to Clay's passing contention, she was not "strip searched" within the meaning of IOWA CODE § 702.23, because she has failed to generate any genuine issues of material fact that she was subjected to any "inspection" of her private parts or any "physical probe of any body cavity," as required for the Defendant County Officers' conduct to be a "strip search" within the meaning of § 702.23. *See Torgerson*, 643 F.3d at 1042-43 (explaining that, in response to a motion for summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts," and must come forward with "specific facts showing that there is a genuine issue for trial"). Perhaps more importantly, the Supreme Court and the Eighth Circuit Court of Appeals have repeatedly recognized that federal courts "'d[o] not look to state statutes to assess the validity of an arrest, search, or seizure under the Fourth Amendment.'" *United States v. Burtton*, 599 F.3d 823, 828 (8th Cir. 2010) (quoting *United States v. Bell*, 54 F.3d 502, 504 (8th Cir. 1995)); *accord United States v. McIntyre*, 646 F.3d 1107, 1113 (8th Cir. 2011) ("'[S]tate law violations do not necessarily offend the Federal Constitution." (quoting *Burtton*, 599 F.3d at 828)); *Rose v. City of Mulberry, Ark.*, F.3d 678, 680 (8th Cir. 2008) ("'Just as a search authorized by state law may be an unreasonable one under [the Fourth Amendment], so may a search not expressly authorized by state law be justified as a constitutionally reasonable one.'" (quoting *Cooper v. California*, 386 U.S. 58, 61 (1967)). Thus, IOWA CODE § 702.23 does not establish that Clay was subjected to a "strip search," let alone that

---

[6] I am also troubled by the County Defendants' description of the incident in which Clay was ordered to remove her under-wire bra, then subjected to forcible removal of her bra when she refused, as a "clothing exchange."

she was subjected to an "unreasonable" invasion of her Fourth Amendment privacy rights.

I conclude that Clay has generated genuine issues of material fact that the Defendant County Officers engaged in a "strip search" within the broadest definition of that "imprecise term" identified in *Florence v. Board of Chosen Freeholders of Cnty. of Burlington*, ___ U.S. ___, 132 S. Ct. 1510 (2012)—that is, that she was "instruct[ed] to remove clothing while an officer *observe[d]* from a distance of, say, five feet or more," *see* ___ U.S. at ___, 132 S. Ct. at 1515 (emphasis added). Nevertheless, such a "strip search" does not require "reasonable suspicion." *See Peters*, ___ F. Supp. 2d at ___, 2013 WL 5775027 at *28-*30. Moreover, nomenclature is not the ultimate *legal* issue, because the constitutionality of the search turns on the reasonableness of removing Clay's bra in the presence of male and female officers and the force used to remove her bra when she refused to do so. *See id.* at *30.

Even so, for essentially the reasons stated in *Peters*, ___ F. Supp. 2d at ___, 2013 WL 5775027 at *31, describing the incident in which Clay was stripped as a "strip search" or even as a "search" is, at best, misleading, and at worst, invites jurors to decide the case on an improper, emotional basis. *See, e.g.,* FED. R. EVID. 403, and advisory committee comment. The Defendant County Officers allegedly "stripped" Clay, and such conduct was at least technically a "search," *see Arnzen v. Palmer*, 713 F.3d 369, 372 (8th Cir. 2013) (explaining that a "search" within the meaning of the Fourth Amendment occurs when "'the government violates a subjective expectation of privacy that society recognizes as reasonable,'" *i.e.*, without reference to the purpose of the officers' conduct (quoting *Kyllo v. United States*, 533 U.S. 27, 31–33 (2001)); *see also Stanley v. Henson*, 337 F.3d 961, 962 (7th Cir. 2003) (not accepting the defendants' argument that a "clothing exchange" was not a "strip search," because the jail officer's insistence on continuously observing the "clothing exchange" implied that

a "search" was occurring, but noting that whether or not the incident was described as a "strip search" or "search" did not change the legal question of the reasonableness of the search). Even so, the Defendant County Officers have never claimed that they were *searching* for contraband; they have asserted that they *knew* Clay had contraband within the meaning of Jail SOG § 4.10.1(6)(a), because she was wearing an under-wire bra, and Clay has conceded that the Jail SOG required removal of her under-wire bra.

Consequently, I will refer to the part of the claim in Count IV premised on forcible removal of Clay's bra in the presence of male and female officers as a claim of "violation of privacy rights." This description recognizes both the conduct and the right at issue, without the potential for misleading the jurors or inviting a decision based on an emotional response. This description of this part of the claim in Count IV is also consistent with *Hill v. McKinley*, 311 F.3d 899 (8th Cir. 2002), in which the Eighth Circuit Court of Appeals described claims that a female detainee was required to disrobe in the presence of a male officer, required to walk through the jail nude in the presence of male officers, and restrained nude on a restrainer board in the presence of male officers as claims of "violation of privacy rights" in violation of the Fourth Amendment. *See* 311 F.3d at 903.

The County Defendants also contend that it is not altogether clear whether Clay's claims arising from the incidents during booking are subject to a Fourth Amendment standard. For the reasons stated in more detail in *Peters*, ___ F. Supp. 2d at ___, 2013 WL 5775027 at *21-*22 and *41-*42, I conclude that a "reasonableness" standard, either from or like the Fourth Amendment standard, applies to Clay's "violation of privacy rights" and "excessive force" claims in Count IV.

### 2. *"Qualified immunity"*

I will consider whether or not the County Defendants are entitled to qualified immunity on each of Clay's claims in turn. I will begin with the "violation of privacy rights" claim that I have concluded is asserted as the first part of the claim in Count IV.

### a. *Clay's "violation of privacy rights" claim*

### i. *Arguments of the parties*

The County Defendants contend that the regulation requiring removal of Clay's under-wire bra was designed to achieve the rational goal of preventing inmates from using the wire to create a weapon to harm themselves or others or to fashion a tool to be used in an attempt to escape. They contend that the Supreme Court has recognized that maintaining institutional security is a legitimate goal that may require retracting or limiting constitutional rights of pretrial detainees. They also contend that the forcible removal of Clay's bra in the presence of male and female officers, when she refused to remove it herself and had displayed a lack of cooperation, was not an exaggerated response to the situation. They contend that the presence of male officers, who only assisted in restraining Clay, was reasonable under the circumstances for the same reasons, that is, that Clay was upset, yelling, screaming, and refusing to change into a jail jumpsuit, and the male officers only intervened to enforce the order, and then did not observe or examine Clay's private body areas. They argue that Clay has failed to demonstrate that the right allegedly violated was "clearly established," because she has not pointed to any precedent establishing that the specific conduct at issue—not just unreasonable searches in general—would be unconstitutional.

In response, Clay argues that the Defendant County Officers are not entitled to "qualified immunity," because "reasonable suspicion" was required for the "strip search"—a contention that I have already rejected—and because, whether or not "reasonable suspicion" was required, there was no legitimate justification for the "strip

search." She argues that, pursuant to jail policy, there were only two reasons for officers to watch a detainee undress: (1) the detainee was suspected of concealing contraband or a weapon and needed to be strip-searched, or (2) the detainee was a suicide risk and needed to be placed in a paper jail suit. She argues that the officers have all conceded that they did not believe that Clay was concealing contraband or a weapon or that she was a suicide risk. Thus, she argues that there was no justification for officers observing her while she changed into a jail uniform. She contends that, even if she voluntarily removed her bra, after being thrown on the bunk, and that the Defendant County Officers did not forcibly remove her bra, as the Defendant County Officers have elsewhere alleged, the presence of male officers and female officers in the cell while she changed into a jail uniform was unreasonable.

### ii.    Analysis

As to the "violation of rights" prong of the "qualified immunity" analysis, *see Burton*, ___ F.3d at ___, 2013 WL 5336524 at *3, I must consider whether the factual record, viewed in the light most favorable to Clay, supports a conclusion that the Defendant County Officers violated Clay's constitutional rights. *SL ex rel. Lenderman v. St. Louis Metro. Police Dep't Bd. of Police Comm'rs*, 725 F.3d 843, 850 (8th Cir. 2013). This question is answered by applying the "reasonableness" standard determined just above, involving "a balancing of the need for the particular [intrusion] against the invasion of personal rights that the search entails," *Bell v. Wolfish*, 441 U.S. 520, 559 (1979), or at least, on a motion for summary judgment, determining whether there are genuine issues of material fact on this inquiry. For the reasons explained above, "reasonable suspicion" is not part of the inquiry or a requirement for "reasonableness" in this case, however.

Determination of the "need for the particular intrusion" requires consideration of the following factors:

> (1) the justification for initiating the [intrusion], (2) the scope of the particular intrusion, (3) the place in which the [intrusion] is conducted, and (4) the manner in which it is conducted. [*Bell*,] 441 U.S. at 559, 99 S.Ct. 1861.

*Schmidt*, 557 F.3d at 572. "These factors are used to balance the need for a particular [intrusion] with the rights of the individual [subjected to the intrusion]." *Id.* (citing *Bell*, 441 U.S. at 559). The "rights of the individual" are "diminished" in the case of a pretrial detainee, *see Maryland v. King*, ___ U.S. ___, 133 S. Ct. 1958, 1978 (2013), but a highly invasive intrusion may nevertheless invade those rights. *Bell*, 441 U.S. at 560.

Clay's argument concerning the "justification for the intrusion"—that there was no concern that she was concealing contraband or a weapon or that she was suicidal to justify the removal of her street clothes—is simply misdirection. There is no dispute that the Defendant County Officers *knew* that Clay was wearing an under-wire bra; that Jail SOG § 4.10.1 required removal of an under-wire bra; that Officer Strim told Clay that she would have to remove her under-wire bra and change into a jail jumpsuit, which Officer Strim brought to the cell; that Officer Strim then expressly directed Clay to remove her under-wire bra and to change into a jail jumpsuit, pursuant to jail policy; or that Clay refused to do so. Thus, "the justification for initiating the [intrusion]" factor, *Schmidt*, 557 F.3d at 572, shows only that there was sufficient (or at least "objectively reasonable") "need for the particular intrusion."

Clay does not complain about "the place in which the [intrusion] [wa]s conduced," *id.*, although she does complain about the presence of the Defendant County Officers, male and female, and the forcible removal of her bra, which are matters going to the *second* and *fourth* factors considering the "scope" and "manner" of the intrusion. *Id.*

Because I have construed this part of Clay's claim in Count IV as limited to the removal of Clay's clothes, for the reasons stated in *Peters*, ___ F. Supp. 2d at ___, 2013 WL 5775027 at *35, the scope of the intrusion was small—because it involved no inspection of Clay's naked body or genitalia and no probing of her body cavities—and no reasonable juror could find that the limited "scope" of the intrusion undermined the "need for the intrusion." Where I have construed this part of the claim in Count IV to be limited to the presence of officers (male and female) and the forcible removal of Clay's bra, without encompassing the degree of force used to effect the removal of Clay's bra—which I have construed to be the basis for her "excessive force" claim in the second part of Count IV—the "manner" of the intrusion does not present a jury question here. Clay has cited no authority and no facts in the record that would have suggested that an objectively reasonable officer would not have acted promptly to compel Clay's compliance with the order to remove her under-wire bra, in the face of Clay's loud and repeated refusals to do so, where her under-wire bra was defined as contraband for the reason that it posed a risk to jail safety and security. Nor has Clay cited any authority or facts in the record suggesting that it would have been "objectively reasonable" to wait until additional officers of the same sex could come to the aid of Officers Delaney and Strim before forcibly removing Clay's bra. Indeed, the law is to the contrary. *See Hill*, 311 F.3d at 903 ("[W]e cannot say in light of precedent that it is a violation of a prisoner's Fourth Amendment privacy rights for a male guard to require a loud and violent female prisoner to disrobe in his presence before placing her in a padded cell for her own safety.").

Where no reasonable juror could find that the intrusion was not substantially justified, the justification for the intrusion weighs heavily against the detainee's diminished expectation of privacy. *See Schmidt*, 557 F.3d at 572 (requiring a balancing of these factors). Here, no reasonable juror could find that the relatively slight

invasiveness of the substantially justified intrusion in this case—which involved no inspection of Clay's naked body or genitalia and no probing of her body cavities—was conducted in an objectively unreasonable manner, even though it involved the forcible removal of Clay's bra in the presence of male officers, such that it was contrary to a detainee's reduced expectations of privacy.

Therefore, the answer to the first "qualified immunity" inquiry is "no," because Clay has not generated genuine issues of material fact that her "privacy rights" were violated.

In addition or in the alternative, I also conclude that Clay has failed to generate genuine issues of material fact that the right purportedly violated was "clearly established." *See Burton*, ___ F.3d at ___, 2013 WL 5336524 at *3 (second prong of the "qualified immunity" analysis). Here, as a matter of law, the Defendant County Officers neither knew nor reasonably should have known that their actions would violate Clay's privacy rights. *Scott v. Baldwin*, 720 F.3d 1034, 1036 (8th Cir. 2013); *Bishop v. Glazier*, 723 F.3d 857, 961 (8th Cir. 2013) (explaining that whether a constitutional right at issue was "clearly established" is a question of law for the court to decide). Rather, this is a case in which it is plain that the specific constitutional right that Clay asserts was not "clearly established," even if there was such a right. *Cf. Pearson*, 555 U.S. at 236-37. Clay's reliance on *Richmond v. City of Brooklyn Center*, 490 F.3d 1002, 1008 (8th Cir. 2007), is misplaced, because that decision states only that the law was clear that removal of a detainee's clothing "should" be conducted by officers of the same sex, the officers who conducted the challenged search in that case were of the same sex as the plaintiffs, and the decision says nothing about circumstances in which the presence of officers of the opposite sex would be warranted. On the other hand, *Hill v. McKinley*, 311 F.3d 899, 903 (8th Cir. 2002), suggests that the presence of officers, even officers of the opposite sex, may be appropriate when a

detainee is required to disrobe. Clay's reliance on a "generalized right" to be free from an unreasonable search is not sufficient to "clearly establish" the specific right on which her claim hangs for purposes of "qualified immunity." *Ashcroft v. al-Kidd*, ___ U.S. ___, ___, 131 S. Ct. 2074, 2083 (2011). Thus, the answer to the second "qualified immunity" question on this claim is also "no."

Therefore, the County Defendants are entitled to summary judgment on Clay's "violation of privacy rights" claim in Count IV on the basis of "qualified immunity."

### b. Clay's "excessive force" claim

The County Defendants also assert that they are entitled to summary judgment on Clay's "excessive force" claim, assuming that she has asserted one. I have construed the second part of her claim in Count IV as alleging that the Defendant County Officers enforced the order to remove her bra in an "unreasonable" and "violent" manner as an "excessive force" claim. Whether or not any of the County Defendants are entitled to "qualified immunity" on this claim presents a much closer question and depends upon the specific conduct of each of the officers involved.

### i. Arguments of the parties

As noted, above, the County Defendants expressly argue that this part of Clay's claim in Count IV "boils down to an allegation that the officers used excessive force in removing her clothes." County Defendants' Summary Judgment Brief at 15. They argue that, even viewing the facts in the light most favorable to Clay, the use of force to remove her bra in order to enforce jail policy was "objectively reasonable," so that they are entitled to "qualified immunity." They point out that Clay was upset and yelling at the officers at the booking counter, that her anger escalated, that she refused to answer standard booking questions, that the booking process was terminated, and that she disobeyed Officer Strim's order to remove her bra. They argue that Officer Strim's order was reasonable for reasons of institutional safety and that Clay's refusal

was without justification. They argue that, when Clay refused, the female officers' decision to use force to enforce the order was reasonable, and the male officers' decision to come to their assistance was also reasonable. The County Defendants also argue that the force used to enforce the order was not abusive or humiliating.

In response, Clay argues that the evidence demonstrates that the order was enforced in a physically abusive way, because Officers Strim and Delaney picked her up and threw her on the concrete bunk, banging her head against the cell wall, and causing her injuries that she and her treating physician identified as a concussion, neck pain, a large bump on the right back of her head, pain and swelling in her right knee, pain and swelling over her right temporal area, and a dime-sized abrasion on her mid-back. She also points to her testimony that the blow to her head was so severe that she was confused and nearly lost consciousness thereafter. She contends that the abusive manner in which the Defendant County Officers enforced the order was not only unreasonable, but contrary to "clearly established" law that a search may not be conducted in an abusive manner.

### ii. Analysis

I conclude, first, that Clay has generated genuine issues of material fact as to the "violation of rights" prong of the "qualified immunity" analysis of this claim, *see Burton*, ___ F.3d at ___, 2013 WL 5336524 at *3, in light of the standards for an "excessive force" claim set out in detail in *Peters*, ___ F. Supp. 2d at ___, 2013 WL 5775027 at *43-*55. Even though a detainee's failure to comply with an officer's orders may make a decision to use force "objectively reasonable," and the order in question here went to the safety and security of the institution and the detainees, *see, e.g., Hickey v. Reeder*, 12 F.3d 754, 749 (8th Cir. 1993); *Johnson-El v. Schoemehl*, 878 F.2d 1043, 1048-49 (9th Cir. 1989), that does not mean that the *amount of force* used to compel compliance with the order was necessarily "objectively reasonable," in

light of both the *particular method or type of force used* and the *degree of injury caused*.

Here, the County Defendants appear to have accepted, for the sake of argument, Clay's allegations that Officers Strim and Delaney "threw" her onto the cell bunk to compel her compliance with the order, and Clay has generated genuine issues of material fact from her citations to her deposition testimony (albeit not in response to the County Defendants' Statement Of Undisputed Material Facts or in her own Statement Of Additional Material Facts, but in her Resistance Brief) that in doing so, these officers banged her head against the cell wall with sufficient force to cause her to be confused and almost to lose consciousness. Although the inferences to be drawn from and the weight to be given to the testimony of Clay's treating physician about the extent and source of Clay's injuries may be doubtful or small, when he did not examine Clay until nine days after the incident, those questions are for the jury. For summary judgment purposes, the physician's testimony is enough to generate genuine issues of material fact about the extent and cause of Clay's injuries from the incident in the Jail, at least when coupled with Clay's testimony. In short, Clay has generated genuine issues of material fact that the method of force was exaggerated and caused disproportionate and unnecessary injury, *see Hickey*, 12 F.3d at 749, and, thus, has generated genuine issues of material fact that her rights were violated.

Nevertheless, as demonstrated by Clay's arguments and citations to the record, the only County Defendants who engaged in conduct that a reasonable juror could find violated her rights are Officers Strim and Delaney, because they are the officers who allegedly "threw" Clay onto the cell bunk causing her to bang her head against the bunk or cell wall. Clay has failed to generate genuine issues of material fact that the conduct of the male officers in coming to the assistance of Officers Strim and Delaney involved any violative conduct, where they purportedly only assisted in restraining

Clay, and there are no allegations that any of them did anything to cause Clay's head to bang against the bunk or cell wall.

Turning to the second prong of the "qualified immunity" analysis, whether the right was "clearly established," *see Burton*, ___ F.3d at ___, 2013 WL 5336524 at *3, the decisions in *Hicks v. Norwood*, 640 F.3d 839 (8th Cir. 2011), and *Moore v. Novak*, 146 F.3d 531 (8th Cir. 1998), discussed in detail in *Peters*, ___ F. Supp. 2d ___, 2013 WL 5775027, both of which antedate the conduct at issue in this case, would have led a reasonable jail officer to believe that it was "objectively reasonable" and permissible to use force to compel compliance with an order to change into jail clothing, as a legitimate order going to the safety and security of the jail, the officers, and the detainees, including Clay. Those decisions, however, would not have led a reasonable jail officer to believe that it was "objectively reasonable" and permissible to bang an unresisting detainee's head against hard surfaces as the type and amount of force appropriate to compel compliance with the order. Rather, if the jurors conclude, from the disputed evidence, that the officers banged Clay's head against hard surfaces, particularly while she was not resisting, as the type of force used to restrain her, an issue on which I have concluded that there are genuine issues of material fact, then the jurors could also conclude that the use of such force was "gratuitous," *see Chambers v. Pennycook*, 641 F.3d 898, 907-08 (8th Cir. 2011) 907-08, and no officer could have believed that doing so would not violate Clay's right to be free from "excessive force."

Again, Clay has generated genuine issues of material fact on the "clearly established" right prong only as to Officers Strim and Delaney, the officers who allegedly banged her head against the bunk or cell wall to enforce the order, not as to the male officers who came to the assistance of Officers Strim and Delaney. Clay has identified nothing in the record to indicate that the male officers used "gratuitous" force simply to restrain her after Officers Strim and Delaney "threw" her on the bunk.

Therefore, I conclude that, as a matter of law, the violative nature of the particular conduct of "banging" an unresisting detainee's head against hard surfaces to compel compliance with an order to disrobe was "clearly established," *Bishop*, 723 F.3d at 961 (explaining that whether a constitutional right at issue was "clearly established" is a question of law for the court to decide), and Officers Strim and Delaney are not entitled to qualified immunity or summary judgment on such a claim. On the other hand, the male officers are entitled to summary judgment on the basis of their qualified immunity to this claim.

### c.    Clay's "free speech retaliation" claim

The County Defendants contend that they are also entitled to summary judgment on Clay's "free speech retaliation" claim in Count V on the basis of the Defendant County Officers' "qualified immunity" to such a claim. Clay disputes this contention.

### i.    Arguments of the parties

For the reasons stated in *Peters*, ___ F. Supp. 2d at ___, 2013 WL 5775027 at *59-*60, I reject the County Defendants' contention that a detainee's speech must be on a matter of "public concern" to obtain First Amendment protection. Therefore, I will not summarize here either the County Defendants' argument on that point or my analysis of it. The argument that I will consider in more detail here is the County Defendants' argument that Clay cannot establish the third element of her "free speech retaliation" claim, which is that the Defendant County Officers' actions were motivated by the exercise of her free speech rights. The County Defendants argue that there is no evidence that the Defendant County Officers were upset by Clay's protests and retaliated for them, but only evidence that the Defendant County Officers were attempting to enforce standard jail policy, which required that Clay remove her under-wire bra, when Clay refused to do so.

Clay responds that there is enough evidence to generate genuine issues of material fact on the "causation" element of her *prima facie* case of "free speech retaliation." She argues, first, that the temporal proximity of the retaliatory conduct to the exercise of her free speech rights—which in this case she argues was very close—raises an inference of retaliatory motive. She also argues that the lack of a legitimate justification for the "strip search" generates a fact question on the motive for it, but I concluded, above, that the Defendant County Officers did have a legitimate justification for using force to remove Clay's bra when she refused.

### ii. Analysis

I reject Clay's "temporal proximity" argument as insufficient to raise a genuine issue of material fact that her protected speech was the reason for her "strip search." It is true that "temporal proximity" may suggest retaliatory intent, at least in employment retaliation cases. *See, e.g., Smith v. Fairview Ridges Hosp.*, 625 F.3d 1076, 1087–88 (8th Cir. 2010) (explaining, in a Title VII case, that temporal proximity between knowledge of protected activity and adverse action may alone support causality in an employment-retaliation case when proximity is very close). It is not enough here, in this civil rights case, however, where the forcible removal of Clay's bra was fully and naturally explained by her refusal to comply with a legitimate order to remove it, as required by Jail SOG § 4.10.1(6)(a). *See Flowers v. City of Minneapolis, Minn.*, 558 F.3d 794, 800 (8th Cir. 2009) (holding, in a First Amendment retaliation case, that "evidence of temporal proximity alone is generally insufficient to raise a triable issue of material fact on retaliatory motive," and finding that, in the case before it, "[t]he timing [of the allegedly retaliatory investigation] is naturally explained by [the defendant officer's] discovery of graffiti and the gang unit's report in August 2004 that [the plaintiff] was related to a gang member," despite the plaintiff's allegations that he was harassed in retaliation for his decision not to plead guilty in a previous criminal

case).  Indeed, it is well-settled that simply enforcing an order that a detainee has refused to obey is not retaliation for the refusal to obey.  *See Walker v. Bowersox*, 526 F.3d 1186, 1189-90 (8th Cir. 2008) (concluding that an inmate's claim that an officer's pepper-spraying him to enforce an order to hand over a food tray was not retaliatory would fail as a matter of law, because the inmate admittedly ignored the officer's repeated orders to hand over the food tray, which could be used as a weapon); *Smith v. Erickson*, 961 F.2d 1387, 1388 (8th Cir. 1992) (*per curiam*); *Orebaugh v. Caspari*, 910 F.2d 526, 528 (8th Cir. 1990) (*per curiam*).  I see no reason why there is an inference that the use of force to enforce an order to remove Clay's bra was retaliatory, simply because Clay's protected activity purportedly involved protests about her detention and the search of her purse, rather than protests about the order to remove her bra, when she admits that she refused to remove her bra as required by a legitimate jail regulation.

Although that is the end of the arguments that Clay expressly asserts in response to the County Defendants' Motion For Summary Judgment on "qualified immunity" to her "free speech retaliation" claim, it is not the end of the matter.  This is so, because Clay has alleged, and argued in other circumstances, that the amount of force used to enforce the order—involving banging her head against the cell wall, which allegedly caused her to become confused and almost to lose consciousness—was an unreasonable and exaggerated response to her conduct in the circumstances.[7]  Clay has generated

---

[7] Again, I am under no obligation "to plumb the record in order to find a genuine issue of material fact" or to "speculate on which portion of the record" might support a non-movant's claim, *see Barge*, 87 F.3d at 260 (8th Cir. 1996) (internal quotation marks and citations omitted), but neither am I required to ignore applicable arguments and identification of facts in the record that might support a claim, even if

(Footnote continued . . .

genuine issues of material fact that the force used to enforce the order to remove her bra was "excessive," because the amount of force used allegedly involved "banging" her head against the cell wall, even though she was not resisting. Evidence that Clay was subjected to "excessive force" (specifically, the alleged "banging" of her head into the cell wall when she was not resisting) to compel compliance with the order to remove her bra might suggest to reasonable jurors that the officers' actions were in retaliation for Clay's protests about her detention and the search of her purse, not simply to enforce the order. *See, e.g., Stewart v. Lyles*, 66 F. App'x 18, 21-22 (7th Cir. 2003) (unpublished op.) (concluding that an inmate stated a retaliation claim, where he complained to an officer that "strip searching" inmates in front of all 130 inmates and several female supervisors in a tailoring shop was contrary to prison regulations, because the officer then singled out the inmate for a more invasive "cavity search"). Thus, Clay has generated genuine issues of material fact on her "free speech retaliation" claim, but only to the extent that she has generated genuine issues of material fact on the "objective reasonableness" of the "amount of force" on her "excessive force" claim. Once again, those genuine issues of material fact are only as to the conduct of Officers Strim and Delaney, who allegedly "threw" her on the bunk and banged her head against hard surfaces, but not as to any allegedly retaliatory conduct of the male officers. Thus, Officers Strim and Delaney are not entitled to summary judgment on Clay's "free speech retaliation" claim on the basis of "qualified immunity" to that claim. In contrast, the male officers are entitled to "qualified

---

those arguments are made and those facts identified in the context of a different claim or issue.

immunity" on that claim, because they were not alleged to have engaged in any "excessive force," which could suggest retaliation.[8]

### 3.    *Other grounds for summary judgment*

Because I have rejected summary judgment on Clay's "excessive force" and "free speech retaliation" claims on the basis of "qualified immunity," I must consider— at least briefly—the County Defendants' other grounds for summary judgment on those claims.  First, I rejected, above, the City Defendants' Motion For Summary Judgment on Clay's claims of violations of the Iowa Constitution on the ground that Chief Judge Linda R. Reade has concluded that the Iowa Supreme Court would likely recognize such an action, as an analogue to an action against federal actors for violations of the United States Constitution in *Bivens*, *see McCabe v. Macaulay*, 551 F. Supp. 2d at 784-85, and I agree with Chief Judge Reade's analysis.  Therefore, I will also deny the County Defendants' Motion For Summary Judgment on the "excessive force" and "free speech retaliation" claims to the extent that they are based on alleged violations of the Iowa Constitution.

Second, my consideration of the part of the County Defendants' Motion For Summary Judgment on the "*Monell* liability" claims against the County and Sheriff Parrett can also be brief.  There can be no "*Monell* liability" on Clay's "violation of privacy rights" claim, because she has failed to generate genuine issues of material fact on a single violation of rights by a municipal officer on that claim.  *See Folkerts v. City of Waverly, Iowa*, 707 F.3d 975, 983 (8th Cir. 2013); *Sitzes v. City of West Memphis,*

---

[8] The County Defendants did not put at issue whether a citizen's right to exercise First Amendment freedoms without facing retaliation from government officials is "clearly established," but there is little doubt on that question.  *See Baribeau v. City of Minneapolis*, 596 F.3d 465, 481 (8th Cir. 2010).

*Ark.*, 606 F.3d 461, 470-71 (8th Cir. 2010); *accord Monell*, 436 U.S. at 691 ("Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort."). Furthermore, even as to Clay's "excessive force" and "free speech retaliation" claims, on which I have found genuine issues of material fact as to violations of Clay's rights, and that some of the officers are not entitled to "qualified immunity," Clay has failed to generate any genuine issues of material fact that the violation of her rights was the result of any policy, custom, or practice. *Atkinson*, 709 F.3d at 1214.

Therefore, the County Defendants are not entitled to summary judgment on the remaining "excessive force" and "free speech retaliation" claims, to the extent that they are based on violations of the Iowa Constitution, but the defendant County and the defendant Sheriff are entitled to summary judgment on *all* of Clay's claims, because she has not generated any genuine issues of material fact on the "*Monell* liability" of those defendants.

### 4.    *Summary*

The County Defendants' Motion For Summary Judgment is granted in part and denied in part. Specifically, the motion is granted to the extent that Clay has failed to generate genuine issues of material fact that would preclude "qualified immunity" of the Defendant County Officers on the part of her claim in Count IV alleging a "violation of privacy rights." The Motion is also granted to the extent that Clay has failed to generate genuine issues of material fact on the "*Monell* liability" of the County and the Sheriff on any of Clay's claims in Count IV or Count V. The County Defendants' motion is denied as to Officers Strim and Delaney on the part of Clay's claim in Count IV alleging "excessive force" and on her claim in Count V of "free speech retaliation," because those officers are not entitled to "qualified immunity" on those claims, but the motion is granted as to the male officers identified as defendants

on those claims. Summary judgment is also denied on the "excessive force" and "retaliation" claims as to Officers Strim and Delaney to the extent such claims are based on violations of the Iowa Constitution.

## IV.   CONCLUSION

Upon the foregoing,

1.   Plaintiff Clay's July 1, 2013, Motion To Exclude Expert Testimony And Strike Expert Report Of Donald Leach, II (Motion To Exclude Expert Evidence) (docket no. 50) is **granted in part and denied in part**, as follows:

    a.   The Motion is **denied** to the extent that it seeks exclusion of Mr. Leach's testimony and report in their entirety; but

    b.   The Motion is **granted** to the extent that I will limit Mr. Leach's trial testimony in the ways described above.

2.   The County Defendants' July 10, 2013, Motion For Summary Judgment (docket no. 54) is **granted in part and denied in part**, as follows:

    a.   The Motion is **granted** on the part of Clay's claim in Count IV alleging "violation of privacy rights," because the Defendant County Officers have "qualified immunity" to that claim;

    b.   The Motion is **granted** in favor of the County and the Sheriff, because they have no "*Monell* liability" on any claim;

    c.   The Motion is **granted** in favor of the male Defendant County Officers on the part of Clay's claim in Count IV alleging "excessive force" and her claim in Count V of "free speech retaliation"; but

    d.   The Motion is **denied** as to Officers Strim and Delaney on the part of Clay's claim in Count IV alleging "excessive force," whether that claim is

asserted as a violation of the United States Constitution or the Iowa Constitution; and

e. The Motion is **denied** as to Officers Strim and Delaney on Clay's claim in Count V of "free speech retaliation," whether that claim is asserted as a violation of the United States Constitution or the Iowa Constitution.

3. The City Defendants' July 15, 2013, Motion For Summary Judgment (docket no. 57) is **granted in part and denied in part**, as follows:

a. The Motion is **granted** to the extent that Clay has conceded that the City cannot be liable on the "unconstitutional property search" claim in Count I pursuant to *Monell*; but

b. The Motion is **denied as moot** as to the City Defendants' contention that the City is immune to the claim in Count I pursuant to Iowa Code § 670.4(3); and

c. The Motion is **denied** as to defendant City Police Officer Echter as to Clay's claim in Count I that he unconstitutionally searched her purse, whether that claim is asserted pursuant to the United States Constitution or the Iowa Constitution, because, on the present record, Officer Echter is not entitled to "qualified immunity" on that claim.

4. This case will proceed to trial only on the following claims:

a. Clay's "unconstitutional property search" claim in Count I, but only to the extent that it involves the search of her purse and only against defendant City Police Officer Echter;

b. the part of Clay's claim in Count IV alleging "excessive force," but only against Officers Strim and Delaney (and not the County or the Sheriff or the male officers); and

  c.  Clay's "free speech retaliation" claim in Count V, but only against Officers Strim and Delaney (and not the County or the Sheriff or the male officers), and Clay can prevail on her "free speech retaliation" claim only if she first prevails on her "excessive force" claim.

**IT IS SO ORDERED**.

**DATED** this 6th day of November, 2013.

_____
MARK W. BENNETT
U.S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA